1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   AMBROSIO VILLAGRANA,                )   1:06-cv-01797-OWW-JLT HC
                                         )
12                      Petitioner,       )   FINDINGS AND RECOMMENDATIONS TO
                                         )   GRANT   RESPONDENT'S   MOTION   TO
13                                        )   DISMISS PETITION FOR WRIT OF HABEAS
         v.                              )   CORPUS (Doc. 33)
14                                        )
                                         )   ORDER REQUIRING THAT OBJECTIONS BE
15   ADAMS, Warden,                       )   FILED WITHIN TWENTY DAYS
                                         )
16                      Respondent.       )
                                         )
17

18        Petitioner is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus

19   pursuant to 28 U.S.C. § 2254.

20        The original petition was filed on December 11, 2006, challenging Petitioner's confinement

21   in administrative segregation.  (Doc. 1).  On December 6, 2007, the Court entered Findings and

22   Recommendations to dismiss the petition because it challenged conditions of Petitioner's

23   confinement rather than the fact or duration of Petitioner's incarceration.  (Doc. 8).  On March 3,

24   2008, the District Judge adopted the Findings and Recommendations and entered judgment.  (Docs.

25   10 & 11).  Petitioner appealed the dismissal to the United States Court of Appeals, Ninth Circuit,

26   which, on November 4, 2008,  reversed the dismissal and remanded the case to this Court.  (Doc.

27   20).  In the order reversing the Court, the Ninth Circuit indicated that the Court should have

28   addressed Petitioner's claim, raised in his objections to the Findings and Recommendations, that

1  ongoing confinement in the Secure Housing Unit ("SHU") impacted Petitioner's eligibility for parole

2  as well as Petitioner's request to file an amended petition.  Upon remand, the Court granted

3  Petitioner leave to file an amended petition (Doc. 22), and on December 29, 2008, Petitioner filed his

4  first amended petition, which alleges that his ongoing confinement in the Secure Housing Unit

5  ("SHU") impacted his eligibility for parole and violated his federal due process and equal protection

6  rights.  (Doc. 23).  For reasons that are not clear to the Court, no further action was taken on this case

7  following the filing of the first amended petition until July 2, 2010, when the Court ordered

8  Respondent to file a response to the amended petition.  (Doc. 27).  On October 12, 2010, Respondent

9  filed the instant motion to dismiss, contending that the remaining claim in the amended petition fails

10  to state a claim upon which habeas relief can be granted.  (Doc. 33).  On November 9, 2010,

11  Petitioner filed his opposition to the motion to dismiss.  (Doc. 34).

**DISCUSSION**

12

13      A.  Procedural Grounds for Motion to Dismiss

14          Respondent has filed the instant motion to dismiss the petition for lack of habeas jurisdiction.

15  Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it

16  "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not

17  entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

18          The Ninth Circuit has allowed Respondent's to file a motion to dismiss in lieu of an answer if

19  the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the

20  state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule

21  4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874

22  F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for

23  state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n.12 (E.D. Cal. 1982) (same).

24  Thus, a Respondent can file a motion to dismiss after the court orders a response, and the Court

25  should use Rule 4 standards to review the motion.  See Hillery, 533 F. Supp. at 1194 & n. 12.

26          In this case, Respondent's motion to dismiss is based on a lack of habeas jurisdiction.

27  Because Respondent's motion to dismiss is similar in procedural standing to a motion to dismiss for

28  failure to exhaust state remedies or for state procedural default and Respondent has not yet filed a

1  formal answer, the Court will review Respondent's motion to dismiss pursuant to its authority under

2  Rule 4.

3       B.  Lack of Habeas Jurisdiction.

4       Petitioner was convicted of second degree murder and sentenced to an indeterminate term of

5  twenty-two years to life.   (Doc. 23, p. 8).  On December 8, 1993, Petitioner was validated as an

6  associate of the Mexican Mafia prison gang and placed in the security housing unit ("SHU").  (Doc.

7  23, p. 8).  On July 21, 2005, after a lengthy review, Respondent rejected Petitioner as an inactive

8  gang member based in part on a list of aliases of gang members in good standing, on which

9  Petitioner's name appeared.  (Doc. 23, pp. 13-15).

10       In December 2007, Petitioner had a hearing before the Board of Parole Hearings ("BPH") to

11  determine whether he was suitable for parole.  (Doc. 33, Ex. 1).  At the conclusion of the hearing, the

12  BPH set forth its reasons for finding that Petitioner was not suitable for parole and that he posed an

13  unreasonable risk or threat to public safety if released from prison. (Doc. 33, Ex. 1, p. 70).  After

14  noting that Petitioner continued to be involved with prison gangs, the BPH went on to base its denial

15  on the following factors: the cruel and callous nature of the commitment offense (after the

16  Petitioner's car and the victim's car collided, Petitioner shot the victim five times); a long and

17  increasingly violent prior criminal history, including a conviction for manslaughter; failure to

18  develop a vocation, do prison work, or finish his GED; completion of only "very, very minimal" self-

19  help programs; and the lack of an updated psychological report and parole plans.  (Id., pp. 69-79).

20       A fair reading of the hearing transcript strongly suggests that the BPH did not consider

21  Petitioner to be even remotely suitable for parole.  Petitioner was told that the BPH was attempting

22  to motivate Petitioner, i.e., to "get [him] off the dime" because Petitioner had "almost zero

23  accomplishments" in prison to show his parole suitability to the BPH.  (Doc. 33, Ex. 1, p. 71).  He

24  was told that he had done "nothing to put [himself] in a better place than [he] was when [he] came

25  [to prison]."  (Id., p. 74).  Petitioner was told that until his gang validation "goes away," he would

26  remain in the SHU and that as long as he remained in the SHU, he would not be able to participate in

27  programs that would lead to parole suitability except through "self-study."  (Id., p. 73).  One BPH

28  member summed up the Board's viewpoint as follows:

1  "Inside he's done nothing.  That's his fault; not the institution's fault because of his
2  involvement with [the prison gang].  He has the key and has had the key to his release from
   the SHU from the very beginning and has chosen not to unlock the door, or try even.  He has
3  no vocational, no educational training.

4  The 2001 or 2004 psych report describes him as having a high violence potential; and that's
   certainly borne out by everything that occurred before that time.  The current psychological
5  report is not particularly supportive either.  And so it seems to me very clear that his
   unsuitability is easily shown."

6  (Doc. 33, Ex. 1, p. 64).

7      Petitioner raises three grounds for relief in the first amended petition: (1) Respondent's

8  "arbitrary and over-inclusive labeling of continued prison gang activity" deprives Petitioner of the

9  possibility of release from the SHU and the opportunity to thereby engage in programs for inmates

10 not confined in the SHU; (2) Respondent is violating Petitioner's due process rights by breaching a

11 settlement agreement reached in earlier litigation over the use of "laundry lists" or "roll calls," i.e.,

12 lists of gang members, to validate inmates; and, (3) Respondent is violating Petitioner's equal

13 protection rights by reviewing him under a stricter standard than other inmates similarly situated.

14 (Doc. 23, pp. 8-12).

15     Respondent's motion to dismiss argues that this Court lacks habeas jurisdiction because the

16 actions complained of, i.e., failure to rescind Petitioner's gang validation and SHU confinement, are

17 not likely to accelerate Petitioner's eligibility for parole, and, hence, they do not impact the fact or

18 duration of Petitioner's sentence to a degree that justifies habeas jurisdiction.  (Doc. 33).  Petitioner's

19 opposition argues that he could make a showing of suitability for parole if he were released from the

20 SHU and allowed to engage in programs that other inmates in the general prison population are

21 allowed to undertake.  (Doc. 34, p. 2).  For the reasons set forth below, the Court agrees with

22 Respondent that the Court lacks habeas jurisdiction to consider the merits of Petitioner's three

23 claims, and therefore the Court recommends that the petition be dismissed.

24         1. The Gang Validation And SHU Confinement Did Not Directly Extend

25         Petitioner's Sentence.

26     A federal court may only grant a petition for writ of habeas corpus if the petitioner can show

27 that "he is in custody in violation of the Constitution . . . ."  28 U.S.C. § 2254(a).  A habeas corpus

28 petition is the correct method for a prisoner to challenge the "legality or duration" of his

1   confinement.  Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991), *quoting*, Preiser v. Rodriguez, 411

2   U.S. 475, 485 (1973); Hill v. McDonough, 547 U.S. 573, 579, 128 S.Ct. 2096 (2006)(challenges to

3   the lawfulness of confinement or to particulars affecting its duration are the province of habeas

4   corpus); Advisory Committee Notes to Rule 1 of the Rules Governing Section 2254 Cases.   In

5   contrast, a civil rights action pursuant to 42 U.S.C. § 1983 is the proper method for a prisoner to

6   challenge the conditions of that confinement.   McCarthy v. Bronson, 500 U.S. 136, 141-42 (1991);

7   Preiser, 411 U.S. at 499; Badea, 931 F.2d at 574; Advisory Committee Notes to Rule 1 of the Rules

8   Governing Section 2254 Cases.  While the United States Supreme Court has not addressed whether a

9   challenge to a condition of confinement may be brought in habeas corpus, see Docken v. Chase, 393

10  F.3d 1024, 1028 (9th Cir. 2004), the Ninth Circuit has held that "habeas jurisdiction is absent, and a §

11  1983 action proper, where a successful challenge to a prison condition will *not necessarily* shorten

12  the prisoner's sentence."  Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cir. 2003)(emphasis supplied).

13        In In re Dannenberg, 34 Cal.4th 1061 (2005), the California Supreme Court described the

14  evolution of California's differing treatment of inmates sentenced pursuant to the determinate

15  sentencing law ("DSL") and those sentenced under the indeterminate sentencing law ("ISL") as

16  follows:

17        For decades before 1977, California employed an "indeterminate" sentencing system for
          felonies.  The court imposed a statutory sentence expressed as a range between a minimum
18        and maximum period of confinement–often life imprisonment–the offender must serve.  An
          inmate's actual period of incarceration within this range was under the exclusive control of
19        the parole authority...During most of this period, parole dates were not set, and prisoners had
          no idea when their confinement would end, until the moment the parol authority decided they
20        were ready for release.

21        The DSL, adopted in 1976, largely abandoned this system....

22        Under the DSL, most felonies are now subject, in the alternative, to three precise terms of
          years...The court selects one of these alternatives (the lower, middle, or upper term) when
23        imposing sentence...The offender must serve this entire term, less applicable sentence credits,
          within prison walls, but must then be released for a further period of supervised parole....

24
          However, certain serious offenders, including "noncapital" murderers (i.e., those murderers
25        not punishable by death or life without parole), remain subject to indeterminate sentences.
          These indeterminate sentences may serve up to life in prison, but they become eligible for
26        parole consideration after serving minimum terms of confinement....

27  In re Dannenberg, 34 Cal.4th at 1077-1080 (citations omitted).

28        Effective January 1, 1983, the California legislature added new § 2933 to the state Penal

1   Code, which eliminated the prior credit-earning system and instituted a new system of "work-time"

2   credits for performance in work assignments and educational programs up to a maximum of one day

3   reduction in term for each day of performance.  70 Ops. Cal. Atty. Gen. 49 (1987).  However, § 2933

4   applies *only* to persons sentenced under Penal Code §1170.  Persons convicted under § 1170 are

5   those convicted of an offense for which the specified sentence is one of three time periods of

6   imprisonment in state prison.  Cal. Pen. Code § 1168.  Accordingly, since Petitioner was not

7   sentenced under § 1170, he is not entitled to the normal work-time credits under § 2933 that are

8   awarded to inmates serving determinate sentences.

9           Instead, Petitioner's credit-earning is governed by state regulations.  Section 2290(a) of Title

10  15 provides as follows:

11          "Life prisoners may earn post-conviction credit for each year spent in state prison.  Post-
            conviction credit for time served prior to the hearing at which a parole date is established
12          shall be considered at that parole consideration hearing.  Thereafter, post-conviction credit
            for time served since the last hearing shall be considered at progressive hearings.  In no case
13          may post-conviction credit advance a release date earlier than the minimum eligible parole
            date." [1]

14

15  The suggested amount of post-conviction credit is "4 months for each year served since the date the

16  life term started."  Cal.Code.Regs., tit. 15, 2290(c).   The BPH may grant more or less than four

17  months depending on how much time the inmate's "performance, participation or behavior"

18  warrants.  Id.

19          In order, however, to fully appreciate the limitations of Petitioner's credit-earning capacity as

20  a life prisoner, an explanation of how California's parole system for life prisoners interacts with a

21  life prisoner's credit-earning potential is necessary.  A life prisoner's MEPD is the "earliest date on

22  which an Indeterminate Sentence Law or life prisoner may be legally released on parole."  See Cal.

23  Code Regs., titl. 15, § 3000; see also Cal. Code Regs., tit. 15, § 2000(b)(67).  The CDCR determines

24  the MEPD.  See Cal. Code Regs., tit. 15, § 2400.  However, "[t]he length of time a prisoner must

25  serve prior to actual release on parole is determined by the [BPH]."  Id.

26  _____

27      [1]Title 15 of the Code of California Regulations § 2000(b)(3) defines a "life prisoner" as "a prisoner serving a
    sentence of life with the possibility of parole."  Life sentences may be imposed for, inter alia, second degree murder.  Cal.
    Code Regs., tit. 15, § 2000(b)(3)(B).  Here, Petitioner was sentenced to a life term for second degree.  Accordingly, he falls
28  within the provisions of this regulation vis-a-vis his credit-earning ability.

1    California law provides that, one year prior to a prisoner's MEPD, a BPH panel shall meet

2  with the prisoner and shall set a release date "unless it determines that the gravity of the current

3  convicted offense or offenses, or the timing and gravity of current or past convicted offense or

4  offenses, is such that consideration of the public safety requires a more lengthy period of

5  incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

6  Cal. Penal Code § 3041(a).  Thus, the prisoner's MEPD is the basis for the timing of the initial

7  suitability hearing.

8    Following a parole denial, the BPH "shall hear each case annually thereafter," except that the

9  BPH may schedule a subsequent hearing up to five years "after any hearing at which parole is

10  denied" if the prisoner has been convicted of murder and the BPH finds "that it is not reasonable to

11  expect that parole would be granted at a hearing during the following years and states the bases for

12  the finding in writing."  Cal. Penal Code § 3041.5(b)(2).

13    Following a finding of parole suitability for an inmate convicted of a murder committed on or

14  after November 8, 1978, the BPH sets a base term "established solely on the gravity of the base

15  crime, taking into account all of the circumstances of that crime."  Cal. Code Regs., tit. 15, §

16  2403(a).  The BPH sets a base term by taking into account the "matrix" of suggested base terms,

17  circumstances in aggravation and mitigation, and adjustments for enhancements or other offenses.

18  See Cal. Code Regs., tit. 15, § 2403-2411.  However, the BPH may impose a base term other than

19  one provided in the matrix "if justified by the particular facts of the individual case...."  Id.  Once a

20  base term is set, the BPH may consider awarding post-conviction credit to reduce the base term, up

21  to four months for each year served, depending on the prisoner's performance, participation, and

22  behavior while in prison.  See Cal. Code Regs., tit. 15, § 2400-2410.

23    California Penal Code § 190(a) mandates the application of good behavior credits by the

24  CDCR against the minimum term for second degree murder, i.e., fifteen years, that is imposed by

25  that statute for purposes of establishing the MEPD.  In re Dayan, 231 Cal.App.3d 184, 188 (1991).

26  However, nothing in the statute requires the BPH, or CDCR, to reapply those same credits to the

27  actual term it eventually sets for Petitioner's sentence if, and when, it determines that Petitioner is

28  eligible for parole.  Id.; see also Cal. Code Regs., tit. 15, § 2400 ("The [Department of Correction

1   and Rehabilitation's] decisions pursuant to Penal Code §§ 2930 et seq. do not affect the [BPH's]

2   decision concerning post-conviction credit pursuant to these rules."). Thus, in theory, if a prisoner

3   were determined to be parole eligible at the earliest possible time, credits might be of some use in

4   actually reducing the amount of time a prisoner served before his initial parole suitability hearing

5   was set. See People v. Rowland, 134 Cal.App.3d 1, 13-14 (1982). However, the question of

6   Petitioner's actual release on parole will be determined only by the BPH, and no matter how much

7   time Petitioner has served or how many credits he has accrued, he will not be released until he has

8   been found suitable for parole. Cal. Pen. Code § 3041(b); Cal.Code Regs., tit. 15, § 2281(a).

9          Put simply, the credits that Petitioner is statutorily entitled to earn as a life prisoner can have

10  no direct impact upon the amount of time Petitioner must actually serve, *until* the BPH determines

11  that he is suitable for parole and orders his release, if that time ever comes. Such credits can only

12  impact the establishment of the MEPD for purposes of scheduling a parole suitability hearing date.

13  Here, Petitioner's MEPD was on November 18, 2002, four years prior to the filing of the instant

14  petition. (Doc. 33, Ex. 1, p. 3).

15         There is no evidence that the gang validation and SHU confinement of which Petitioner

16  complains has negatively impacted his credit earning capacity per se; however, even had they done

17  so, because Petitioner has already passed his MEPD, Petitioner's credits, or lack thereof, can have no

18  impact whatsoever on his sentence. To the contrary, at this juncture, only the BPH has the authority

19  at this point to alter the actual amount of time Petitioner is incarcerated prior to parole. Thus, the

20  gang validation and SHU confinement provide no basis for habeas jurisdiction from the standpoint of

21  directly extending Petitioner's period of incarceration.

22         As the Ninth Circuit has indicated, "habeas jurisdiction is absent, and a §1983 action proper,

23  where a successful challenge to a prison condition will not necessarily shorten the prisoner's

24  sentence." Ramirez, 334 F.3d at 858. Here, it is patent that the credits earned by a life prisoner such

25  as Petitioner will not "necessarily shorten" his sentence. Thus, the Court cannot base its habeas

26  jurisdiction upon a credit-earning system that has no impact on the duration of Petitioner's sentence.

27             2. No Indirect Impact On Petitioner's Period Of Incarceration Has Been Shown.

28         Respondent also argues, in essence, that any indirect consequences of gang validation and

1    SHU confinement on the BPH's parole considerations are too attenuated to support this Court's

2    habeas jurisdiction.  Again, the Court agrees.

3          Petitioner does not cite, and the Court is unaware of, any legal authority, much less "clearly

4    established" federal law,  holding that Petitioner has a federal constitutional right to an accurate gang

5    "validation."  Thus, any liberty interest in a gang validation or SHU placement must arise under

6    California law.  A liberty interest arises under state law when an inmate is subjected to restrictions

7    that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of

8    prison life."  Sandin v. Connor, 515 U.S. 472, 484, 115 S.Ct. 2293 (1995).

9          The possibility, however, of a denial of parole at some later time, where one of the

10   considerations for parole is inaccurate information about an inmate's gang membership, does not

11   amount to the denial of a liberty interest.  In Sandin, the U.S. Supreme Court concluded that a

12   possible loss of credits due to a disciplinary conviction was insufficient to give rise to a liberty

13   interest where "[n]othing in [the State's] code requires the parole board to deny parole in the face of

14   a misconduct record or to grant parole in its absence, even though misconduct is by regulation a

15   relevant consideration."  Sandin, 515 U.S. at 487.  The Court went on to note that "[t]he decision to

16   release a prisoner rests on a myriad of considerations," and an inmate is generally "afforded

17   procedural protection at this parole hearing in order to explain the circumstances behind his

18   misconduct record."  Id. at 487.  The Court held that "[t]he chance that a finding of misconduct will

19   alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process

20   Clause."  Id.

21         After Sandin, in order to demonstrate a liberty interest, an inmate must show that a

22   disciplinary conviction will inevitably lengthen the duration of the inmate's incarceration.  Id.  The

23   Court finds no logical or practical basis upon which to distinguish the instant allegation, i.e., that an

24   erroneous gang "validation" impacted Petitioner's chances for parole, from the allegation in Sandin

25   that an erroneous disciplinary finding affected the inmate's chances for parole.  Accordingly, the

26   same result should obtain, i.e., that Petitioner does not have a liberty interest in an accurate gang

27   validation.  Since Petitioner has failed to establish that such an erroneous validation will "inevitably

28   lengthen the duration" of his incarceration, there is no due process interest at issue and thus no basis

1  for this Court to assert its habeas jurisdiction.

2        As Respondent correctly observes, and as recounted above, in addition to the gang validation,

3  the BPH relied on a variety of factors as bases for finding Petitioner unsuitable for parole, including

4  the nature of the commitment offense, Petitioner's extensive and increasingly violent criminal

5  history, his failure to obtain a GED or vocational training, his failure to engage in other than the most

6  minimal self-study programs, and his lack of an updated psychological profile and parole plans.

7        From the foregoing it is obvious that, contrary to Petitioner's contentions, the BPH relied on

8  a wide variety of factors that extend far beyond the mere fact of Petitioner's gang validation.  Under

9  such circumstances, the Court cannot conclude that Petitioner's gang validation "inevitably

10 lengthen[ed] the duration" of Petitioner's confinement; to the contrary, such a correlation is simply

11 too attenuated to invoke the procedural guarantees of the Due Process Clause."  See Sandin, 515

12 U.S. at 487.[2]

13                                    **RECOMMENDATION**

14        Accordingly, the Court HEREBY RECOMMENDS that the motion to dismiss (Doc. 33), be

15 GRANTED and the habeas corpus petition be DISMISSED for Petitioner's failure to raise a

16 cognizable habeas claim.

17        This Findings and Recommendation is submitted to the United States District Court Judge

18 assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

19 Local Rules of Practice for the United States District Court, Eastern District of California.

20 Within twenty (20) days after being served with a copy, any party may file written objections with

21 the court and serve a copy on all parties.  Such a document should be captioned "Objections to

22 Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

23 filed within ten (10) court days (plus three days if served by mail) after service of the objections.

24 The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

25 parties are advised that failure to file objections within the specified time may waive the right to

26

27        [2]For the same reasons as discussed in this section, the Court rejects Petitioner's second ground for relief, i.e., the
28 arbitrary and capricious nature of Respondent's gang validation process, because, even if true, that fact would not "inevitably
   lengthen" Petitioner's sentence, and, therefore, it is too attenuated to support this Court's habeas jurisdiction.

1  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2

3  IT IS SO ORDERED.

4  Dated:  **February 18, 2011**                                  **/s/ Jennifer L. Thurston**
                                                         UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28